# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1998-DP-01149-SCT

*LEROY LYNCH*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 6/5/1998 |
| TRIAL JUDGE: | HON. KENNETH L. THOMAS |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CHERYL ANN WEBSTER |
| | AZKI SHAH |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: |
| | JUDY T. MARTIN |
| | MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | LAURENCE Y. MELLEN |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 05/27/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Leroy Lynch appeals his capital murder conviction and sentence of death determined by a Bolivar County Circuit Court jury. The jury returned a guilty verdict against Lynch, finding that he acted in concert with Kevin D. Scott, who killed Richard Lee in the course of a robbery; therefore, Lynch committed capital murder pursuant to Miss. Code Ann. § 97-3-19(2)(e). After a sentencing hearing, the jury determined that Lynch should be given the penalty of death. The trial court entered judgment and sentenced Lynch to death by lethal injection. Lynch subsequently made a motion for judgment of acquittal notwithstanding the verdict

or in the alternative a new trial. The trial court denied Lynch's motion. Lynch filed his notice of appeal with this Court.

**FACTS**

¶2.     On November 14, 1995, Kevin D. Scott wrecked his white Oldsmobile Sierra with a luggage rack on the trunk. The next day, Scott asked his friend Leroy Lynch to go with him to Cleveland, Mississippi to get a replacement car similar to the one wrecked. Scott picked up Lynch at his girlfriend's house in Clarksdale, Mississippi. Scott was driving his brother's car, a brown Chrysler.

¶3.     According to Lynch's testimony, he and Scott drove to Davenport, where Scott independently retrieved a gun from Scott's residence. The two then drove to Cleveland, Mississippi.

¶4.     Upon their arrival in Cleveland, Lynch and Scott, looking for the similar car, "cruised" the parking lots of at least four stores, including Wal-Mart, Kroger, Fred's, and Jitney Jungle. Scott ultimately saw a white Oldsmobile with a luggage rack on the trunk in of Jitney Jungle the parking lot and parked next to it. Once Scott parked the car, Lynch went inside Jitney Jungle to use the restroom. Lynch also testified that he saw the driver of the car going into the store. When the driver of that car, Richard Lee, exited the store and drove out of the parking lot, Scott and Lynch followed him to a sandwich shop. Lynch and Scott waited outside while Lee went inside the store. Lee returned to his car and went on to another store. Lynch and Scott followed Lee once again, waiting outside while Lee went into the store. Finally, Lynch and Scott followed Lee to his home in Boyle, Mississippi.

¶5.     At the Lee residence, Scott parked the car on the street and approached Lee, who was seated in his car in the carport. Lynch stayed behind in the car parked on the street. Lurline Lee, Richard Lee's wife, saw her husband talking a tall, thin African American man outside in their garage. When Mrs. Lee opened the glass garage door to see what was going on, Lee advised her, "Honey, he has a gun." Scott

2

then fired two shots at Mrs. Lee. She ducked back inside the house and dialed 911. While inside, Mrs. Lee heard several additional gunshots.

¶6.     When Lynch heard the gunfire, he moved to the driver's side of the car and drove away. In his rearview mirror, Lynch saw Scott backing out of Lee's driveway in Lee's car. Lynch testified he did not know Scott was going to shoot Lee. Driving Lee's vehicle, Scott later passed Lynch somewhere between Boyle and Davenport.

¶7.     Richard Lee's body was discovered in the Lee's garage. Emergency medical technicians from Bolivar County Hospital attempted to revive Lee at the scene. He died a few hours later from a bullet wound to the head.

¶8.      According to witness Doris Ivy, a resident of Bobo, Mississippi, on the day of the shooting, she saw a brown car driving "real slow." She said "the Lynch boy" stopped the brown car, got out, and stood on the side of the road looking across the field toward the old gin. Doris testified that it was Leroy Lynch she saw on the side of the road and identified him in the courtroom. She testified that a car in photographic exhibits the prosecution showed her appeared to be the same car she saw Lynch driving that day.

¶9.     In addition, Steven Ivy testified that he saw Leroy Lynch on Davenport Brandon Road "driving real slow" heading north from Bobo toward Davenport. Steven said that Lynch was "looking off into the fields" at a white car. He testified that he was able to see the white car. Lynch was alone, driving a brown Chrysler. When shown the same photographs identified by Doris Ivy, Steven identified the car being driven by Lynch and said that the car, to his knowledge, belonged to Kevin Scott's brother. He identified Lynch in court as the person he saw driving the brown Chrysler. Ivy said he'd known Lynch all of Lynch's life and he knew Lynch when he saw him.

¶10.    On the day of the shooting, the Bolivar County Sheriff's Department discovered the Lee's car abandoned near an old gin at Bobo, Mississippi. After searching the immediate area, authorities found a coat in a hole near the old gin. There was a wallet inside one of the pockets, and police found an envelope and a handgun wrapped inside the jacket. The wallet contained Kevin Scott's driver's license. The gun was registered to D'Angelo Johnson, Lynch's cousin, and former step-father.

¶11.    D'Angelo Johnson testified that he had purchased the .380 pistol in 1995. He identified the pistol and the firearm application. He further stated that Leroy Lynch discovered the .380 pistol under the seat of Johnson's car several months before the shooting. Upon discovering the gun, Lynch asked Johnson who owned the gun and what was wrong with it. Lynch asked if Johnson wanted Lynch to get it fixed. Johnson at first said no, but ultimately stated Lynch could if he wanted to do so. However, Johnson stated that he took the gun from Lynch and placed it back under the seat of the vehicle. Johnson was unaware that Lynch had removed the gun from beneath the seat again. When the two got back to Johnson's house, Lynch went down the street to see a friend. Lynch called Johnson from his friend's house and said he was going home. About a month later, Lynch called Johnson and said that he had put Johnson's gun in the pawnshop. Johnson had not been aware that the gun was missing until he spoke to Lynch that day. Johnson testified that Lynch was the last person he saw with the gun and identified Lynch in court.

¶12.    On November 16, 1995, the day after the shooting, Leroy Lynch was taken into custody for questioning by the Bolivar County Sheriff's Department. During questioning, the following transpired:

> Q:      Alright, and what did he [Scott] tell you what y'all was going to do...that he was going to do?
>
> A:      He said he was gone get a car.
>
> Q:      Said he was goning [sic] to get a car?

A:     Uhm huh.

Q:     Alright and what happened to his car?

A:     He had wrecked it.

Q:     And he was going to get a car kinda that looked like his?

A:     Yes.

Q:     And uh, what was he going to carjack somebody and take there [sic] car or what?

A:     I think so.  I really don't know.

¶13.    Lynch used the follow-up sentence, "I really don't know," with several of his statements made both in court and out of court.  Other Inconsistencies from Lynch on the witness stand were prevalent in this case.  Lynch testified that Scott was "following this dude to Pig Pen and then the liquor store and then to his house."  When counsel then asked him if he knew the reason Scott was following the person, Lynch replied, "No, I was lying down at the time."  This statement contradicts Lynches later testimony that he did not lie down in the car until Scott left the liquor store, following Lee.

Counsel asked:          And so when was it that you started lying down?

Lynch replied:   Right then when we left the liquor store.

Counsel asked:          When he "arrived back at the house what gun, if any, did [he] see there?

Lynch responded:      The gun he had in his hand.

Counsel rephrased the question:          Did you see a gun in his hand or what did you see?"

Lynch replied:   I didn't see nothing in his hand.

¶14. In his statement to Chief Estes, Lynch was asked about the pistol used in the killing and he claimed the gun was Scott's and that he did not know from where Scott had gotten the gun. However, at trial when asked about the gun, Lynch changed his story. Lynch claimed, "I gave him that gun three months ago."

¶15. John Franovick, a forensic scientist specializing in firearm and toolmark identification, was tendered and accepted by Lynch as an expert. He testified that he had compared the projectiles and cartridge cases recovered from the crime scene with the .380 pistol submitted by Bolivar County authorities. He visually examined the gun and test fired it. He stated that it was his opinion that the recovered projectiles were fired in the gun.

## DISCUSSION

¶16. This Court, in reviewing a capital murder conviction and death sentence, must apply "heightened scrutiny." **Flowers v. State**, 842 So. 2d 531, 539 (Miss. 2000) (quoting **Balfour v. State**, 598 So.2d 731, 739 (Miss. 1992)). This method of review requires the Court to resolve all doubts in favor of the accused because "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." **Id.** *See also* **Fisher v. State**, 481 So.2d 203, 211 (Miss. 1985).

> **I.    Whether the Trial Court Erred in Failing to Give the Jury the Following Instruction: If You Can Reconcile The Evidence Upon Any Reasonable Hypothesis Consistent With The Defendant's Innocence, You Should Do So And Find Him Not Guilty**.

¶17. Lynch argues that the trial court erred in failing to submit Instruction D-8338-1 to the jury. This instruction states "[i]f you can reconcile the evidence upon any reasonable hypothesis consistent with the Defendant's innocence, you should do so and find him not guilty." Lynch, for the first time on appeal contends that this instruction is "approximately the "two theory" instruction that has been approved and

6

adopted in Mississippi by this Court." Moreover, Lynch argues that the "two- theory" instruction must be given in addition to a basic circumstantial evidence instruction.

¶18.    Lynch offered no instructions in advance. Lynch ultimately offered only one instruction to the trial court and failed to argue to the trial court this instruction was a "two-theory" instruction. Because this one instruction was offered late, the issue of whether the trial court erred in denying the instruction is waived from examination. Though Lynch claims the instruction is a "two theory" instruction, it is not. The trial court modified the State's timely tendered instruction to include the language in Lynch's offered instruction to his satisfaction based upon the mistaken belief that the case was a circumstantial one.

¶19.    After a review of the transcript record of the trial court proceedings, there can be no doubt that Lynch's counsel ultimately merely asked to modify S-1. When that was done utilizing the language that both he and the trial court offered, counsel accepted the instruction as modified without objection. The following exchange between the trial court and counsel for Lynch concerning counsel's failure to submit any jury instructions evidences Lynch's acceptance of the modified instruction:

By the Court: I'm talking about you failure to submit instructions.

By Mr. Shah: I don't have to submit an instruction.

By the Court: But if you're offering one, I'm saying it should be timely made.

By Mr. Shah: I'm offering a modification based on the evidence that has been produced in open court.

By the Court: Let me have you modification then.

By Mr. Shah: I'm saying include the circumstantial evidence instruction in that instruction.

By the Court: All right. Well, I think you understand my point, Mr. Shah. Now what can we do to doctor on this instruction? To Mr. Shah and Mr. Mellen.

By Mr. Mellen: That would be up to Mr. Shah. He's the objector on that.

7

By the Court: You are the movant.

By Mr. Shah: Simply include - - take out reasonable doubt and include the circumstantial evidence instruction.

By The Court: Now, we have to let reasonable doubt stay there and add the language into the exclusion of every - - yes.

By Mr. Shah: Every reasonable hypothesis consistent with defendant's innocence.

Later the Court inquired:

By the Court: You [sic] response to S-1 which has been modified, of course, to include the circumstantial language in the second paragraph.

By Mr. Shah: We have no objections.

¶20. The State argues that this issue is waived because Lynch failed to submit the instruction in a timely manner and has therefore failed to meet the requirements of Uniform Circuit and County Court Rule 3.07. In the alternative, the State contends that the instruction is not required in general and that it is not appropriate here because this is not a purely circumstantial evidence case. Indeed, the issue is barred from examination due to the waiver resulting from the violation of the rules. Procedural bar notwithstanding, we proceed to address the merits of the issue.

¶21. Much of the authority cited by Lynch involves purely circumstantial cases, unlike Lynch's case, and those cases are distinguishable from this one; however, this is not a purely circumstantial case because Lynch made an "admission on a significant element of the offense" and the alleged admission constitutes direct evidence pursuant to *Taylor v. State*, 672 So. 2d 1246, 1270 (Miss. 1995).

¶22. In *State v. Rogers*, 847 So. 2d 858, 863 (Miss. 2003), this Court again considered the two-theory instruction that is commonly given in circumstantial evidence cases. The Court recognized that the two-theory instruction is required only in purely circumstantial cases. *Id. See also Barnes v. State*, 532

8

So.2d 1231, 1235 (Miss.1988); ***Boches v. State***, 506 So.2d 254, 260 (Miss.1987); ***Clark v. State***, 503 So.2d 277, 278-79 (Miss.1987); ***Keys v. State***, 478 So.2d 266, 267 (Miss.1985); ***Henderson v. State***, 453 So. 2d 708, 709-10 (Miss. 1984); ***Johnson v. State***, 347 So.2d 358, 360 (Miss.1977).

¶23.     In determining whether the defendant was entitled to a two-theory instruction, the Court in ***Rogers*** considered whether the case was purely circumstantial. ***Rogers***, 847 So. 2d at 863.  The ***Rogers*** Court discussed the difference between circumstantial evidence and direct evidence:

> What is "circumstantial evidence"? The least inadequate definition we can provide is that circumstantial evidence is evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist. Conversely, eye witness testimony is thought of as direct evidence.

***Id.*** (quoting ***Keys v. State***, 478 So. 2d 266, 268 (Miss. 1985)).  For purposes of granting a two-theory instruction, "[a] circumstantial evidence case...is one in which there is neither an eyewitness nor a confession to the crime." ***Id.*** at 863 (citing ***Mangum v. State***, 762 So. 2d 337, 344 (Miss. 2000)). However, in ***Taylor v. State***, 672 So. 2d 1246, 1270 (Miss. 1996), we held that an admission as to an important element of the alleged crime obviates the need for a circumstantial evidence instruction.  That is, "[t]here is no reason on principle why an admission by the defendant on a significant element of the offense should not also operate to render unnecessary the circumstantial evidence instruction." ***Conner v. State***, 632 So. 2d 1239, 1256 (Miss. 1993) (overruled on other grounds by ***Weatherspoon v. State***, 732 So.2d 158, 162 (Miss. 1999)).  We held in ***Mack v. State***, 481 So. 2d 793, 795 (Miss. 1985), that "an admission ... [is] a statement by the accused--it may be direct or implied--of facts pertinent to the issue and tending in connection with other facts to prove his guilt." ***Mack***, 481 So.2d at 795 (citing ***Reed v. State***, 229 Miss. 440, 91 So.2d 269 (1956)).

¶24. At the outset, we must determine whether this is a purely circumstantial evidence case. Lynch argues that, according to the definition set out in *Keys*, this is a circumstantial evidence case, while the State argues that this is not a circumstantial evidence case because Lynch made an "admission on a significant element of the offense" and that the alleged admission constitutes direct evidence pursuant to *Taylor*. Thus, according to the State, our requirements for wholly circumstantial evidence cases do not apply here. Specifically, the State points to a portion of Lynch's statement taken the day after the shooting:

Q:    And uh, what was he going to carjack somebody and take there [sic] car or what?

A:    **I think so.  I really don't know.**

(emphasis added).

¶25. Lynch argues that this statement cannot be an admission because it does not contain a time element as to when Lynch first understood that he and Scott were involved in a car-jacking of Lee. It is clear from the context of the questions by law enforcement officers that they were concerned with what Lynch thought before he and Scott arrived in Cleveland, rather than as Lynch argues, what he may have thought after the car-jacking and murder. Lynch's argument to the contrary ignores the plain language of the questions the officers were asking prior to Lynch's admission of, "I think so. I don't really know," in respond to the direct question of whether Scott was going to car-jack somebody and take their car or what.

¶26. We hold that the case at bar is not a purely circumstantial case. Lynch's statement in response to the officer's question is an admission against interest as to the underlying felony. This is true although Lynch at first says, "I think so," and as if by afterthought contradicts himself and says, "I really don't know." Lynch's counsel asked for and was allowed to introduce both the actual tape recording of this statement and the transcript thereof as evidence for the jury to hear, read and consider during their deliberations. This

10

was but one of several inconsistencies in Lynch's testimony and prior statement. The ultimate question of what Lynch meant by this statement and what the truth of the matter actually was is an issue for the jury to determine.

¶27. An admission is but a statement by the accused which may be direct or implied by facts pertinent to the issue and tending to prove his guilt. The intent to rob, or in this case commit a car-jacking, which is necessary to prove the underlying felony of robbery can be shown from the facts surrounding the crime. *Mackbee v. State*, 575 So. 2d 16, 33-34 (Miss. 1990); *Wheat v. State*, 420 So. 2d 229, 238-39 (Miss. 1982); *Voyles v. State*, 362 So. 2d 1236, 1242-43 (Miss. 1978).

¶28. Here, examination of the facts surrounding the crime is revealing indeed. The record reflects that Lynch, knew that Scott was armed with the .380 pistol that Lynch had taken from his cousin and given to Scott. Lynch knew that Scott's purpose in going to Cleveland that day was to get a car exactly like the one Scott had wrecked. They drove around Cleveland but did not go to any car dealerships looking for this identical particular vehicle. Instead, they cruised various store parking lots until they located a vehicle identical to Scott's wrecked vehicle. Scott could have attempted to purchase the vehicle from Lee in a public area of several different locations where Lee stopped prior to going home, if that indeed was his purpose. He did not do so. Lynch could have abandoned this scheme as he exited the vehicle on at least one occasion to use the restroom. Instead, they followed Lee home, a much less public area, where Scott shot Lee in his carport, shot at Mrs. Lee twice, and took Lee's car by force. Lynch claimed to be lying down, but when he heard the shots he drove Scott's vehicle from the scene and was later observed close to the cotton gin where Lee's car was abandoned and items of evidence including the murder weapon were found by authorities. This conflicts with other statements by Lynch. Lynch's first statement given to Chief Estes conflicts with his trial testimony about the gun. Lynch also claims that the Ivy's and his cousin Johnson

11

were lying. The State argues that Lynch was a lookout and was attempting to avoid arrest. Lynch could have informed authorities at the Clarksdale Police Department of his knowledge of this crime when first questioned, but he did not do so. Lynch's later admission to law enforcement officers in Cleveland is direct evidence. Thus, the dictates of *Taylor* apply. His testimony before the jury considering the facts within this record is also direct evidence.

¶29. The case at bar is also similar to *Mack v. State*, 481 So. 2d 793 (Miss. 1985), where Mack's argument was that there were no eyewitnesses who could identify him as the person who broke and entered his mother's residence, the case was necessarily a case of circumstantial evidence requiring circumstantial evidence instructions. *Id.* at 795. This Court, however, concluded that because there was evidence in the case from a witness regarding an admission to her by Mack that he obtained the property in question from his mother without stating that he stole them, therefore, the case was not a circumstantial evidence case. The Court stated:

> While not a confession properly so-called, this evidence does constitute an admission. *Reed v. State*, 229 Miss. 440, 446, 91 So. 2d 269 (1956). As such, it constitutes direct evidence of the crime such that the giving of the familiar circumstantial evidence instruction is not required.

*Id*. Here, Lynch's statement may indeed not be a "confession properly so-called", however it still constitutes an admission nonetheless. *Id*. Further, the Court has stated "There is no reason on principle why an admission by the defendant on a significant element of the offense should not also operate to render unnecessary the circumstantial evidence instruction." *Conner*, 632 So. 2d at 1256. We have also stated:

> In the instant case, the only element proven entirely by circumstantial evidence was that of intent. This Court has held that unless the case against the defendant is purely or wholly circumstantial the defendant is not entitled to a circumstantial evidence instruction. *Bullock v. State*, 391 So. 2d 601 (Miss. 1980), *Edwards v. State*, 413 So. 2d 1007 (Miss. 1982). Thus, it was proper to refuse the appellant's request for a circumstantial evidence instruction.

12

*Williams v. State*, 445 So. 2d 798, 808 (Miss. 1984). Accordingly, we hold that Lynch's case is not a circumstantial evidence case; thus the circumstantial evidence standard is not properly applied to the case at bar.

¶30. Out of an abundance of caution, the trial court modified the existing instructions as requested by Lynch. The instruction offered and presented now as a "two theory" instruction does not meet the restatement definition of a "two theory" instruction. Therefore, the trial court was correct in not using the instruction. It is obvious that the trial court was concerned because counsel had not submitted any jury instructions and even the one at issue here was ultimately agreed to as a modification to S-1 after the trial court raised its concerns. In fact, as previously discussed, counsel for Lynch claimed that he did not have to submit any instructions. Ultimately, as previously noted, Lynch's counsel agreed to the exact language that he had proposed in this instruction to be used in a modification of S-1 which had already been given.

¶31. We find no error with regard to the modified instructions given by the trial court.

### II. Whether the Jury Was Properly Instructed on the Burden of Proof at the Sentencing Phase of the Trial.

¶32. Next, Lynch argues that the sentencing instructions, in setting out requirements of *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), as codified in Miss. Code Ann. § 99-19-101(7), should have included the following circumstantial evidence language: "[t]o return the death penalty in this case you must find unanimously from the evidence beyond a reasonable doubt **and to the exclusion of every reasonable hypothesis** that one or more of the following facts existed...." (emphasis added). That is, Lynch contends that the trial court committed clear error by failing to submit circumstantial evidence language and simply instructing the jury that "to return the death penalty in a case,

you must first unanimously find from the evidence beyond a reasonable doubt that one or more of the following facts exist...." Lynch asserts that this is a circumstantial case; therefore, the sentencing instruction should contain circumstantial evidence language.

¶33. Lynch cites *Duvall v. State*, 634 So. 2d 524, 526 (Miss. 1994); and *Booker v. State*, 699 So. 2d 132, 135 (Miss. 1997), and *Jordan v. State*, 786 So. 2d 987 (Miss. 2001), for the proposition that "when the circuit court grants instructions clearly erroneous and which deny the accused a fair and objective evaluation of the evidence by the jury, we will reverse, even though there was no objection by defense counsel." However, Lynch provides no reasoning as to his assertion that the instruction given is clearly erroneous. Moreover, Lynch cites no authority for his contention that circumstantial language is required in the sentencing instruction. We find that this issue is thus procedurally barred. Alternatively, considering the merits of Lynch's assignment of error, this Court in *Duvall* concluded that, in general, defense counsel's failure to timely object to a proffered jury instruction will act as a waiver of that objection on appeal. *Duvall*, 634 So. 2d at 526. However, where the circuit court grants an instruction that this Court has "clearly held erroneous," the Court does not "hold defense counsel to the same degree of diligence he has on instructions this Court has not ruled upon." *Id.* Thus, this Court held "when the circuit court grants instructions clearly erroneous and which deny the accused a fair and objective evaluation of the evidence by the jury, we will reverse, even though there was no objection by defense counsel." *Id.*

¶34. As discussed above, it is true that in circumstantial evidence cases the state must prove the defendant's guilt beyond a reasonable doubt and to the exclusion of every other hypothesis consistent with innocence. *See*, *Jones*, 797 So. 2d at 927; *Henderson*, 453 So. 2d at 710; *Jackson v. State*, 684 So. 2d 1213, 1229 (Miss. 1996) (quoting *Isaac v. State*, 645 So. 2d 903, 909 n.7 (Miss. 1994)).

However, this Court has never held that circumstantial evidence language is required in charging the jury as to the requirements of Miss. Code Ann. § 99-19-101(7).

¶35. In order to impose the death penalty, a Mississippi jury must make a written finding of one or more of the following factors:

(a)     The defendant actually killed;
(b)     The defendant attempted to kill;
(c)     The defendant intended that a killing take place;
(d)     The defendant contemplated that lethal force would be employed.

Miss. Code Ann. § 99-19-101(7) (Rev. 2000). The State is required to prove one or more of these factors beyond a reasonable doubt. *Holland v. State*, 705 So. 2d 307, 330 (Miss. 1997) (citing *White v. State*, 532 So. 2d 1207, 1219 (Miss. 1988)).

¶36. Here, the trial judge instructed the jury as to each of the *Enmund* factors. While the actual jury instruction is missing from the record, the trial transcript reflects the following charge to the jury:

To return the death penalty in a case, you must first unanimously find from the evidence beyond a reasonable doubt that one or more of the following facts exist.

One, that the defendant actually killed Richard Lee.

Number two, that the defendant attempted to kill Richard Lee.

Number three, the defendant intended the killing of Richard Lee to take place or;

Number four, that the defendant contemplated that lethal force would be employed.

¶37. We find that Lynch's second assignment of error is without merit. First, Lynch waived this issue by failing to cite any authority for the position that circumstantial evidence language is required in the sentencing instruction. Nevertheless, considering the issue on the merits, we conclude that the jury instruction is not clearly erroneous because it comports with the requirements of Miss. Code Ann. § 99-19-101(7) and this Court's jurisprudence regarding the State's burden of proof as to the elements set out in

15

the statute. Furthermore, Lynch's admission is direct evidence of and indicates his awareness that lethal force might be used to steal the car. The jury's finding that Lynch specifically intended that Lee be killed indicates their rejection of any other reasonable hypothesis of his participation.

### III. Whether the Evidence Was Sufficient to Support the Aggravating Circumstance "That the Capital Offense Was Committed for the Purpose of Avoiding or Preventing a Lawful Arrest."

¶38. Lynch argues that there was absolutely no evidence to support the "avoiding or preventing lawful arrest" aggravating factor.[1] Lynch contends that the State was required to prove that Scott killed Lee and that "Lynch aided in some way so that Scott's actions and criminal intent [were] charged to Lynch." The State argues that the evidence presented at trial amply supported the submission of this aggravating circumstance and that it was not required to prove that Lynch aided and abetted Scott in avoiding arrest. In the alternative, the State argues that this Court is required to perform a re-weighing / harmless error analysis should it determine that the "preventing a lawful arrest" aggravating circumstance is invalid.[2]

¶39. Under Mississippi law, the death penalty may be imposed only where the jury unanimously finds in writing that sufficient aggravating circumstances exist. Miss. Code Ann. § 99-19-101(3)(b) (Rev. 2000). One such aggravating factor requires the jury to consider whether "[t]he capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." Miss. Code Ann. § 99-19-101(5)(e) (Rev. 2000).

---

[1]The jury found unanimously that the capital offense was committed (1) for the purpose of avoiding or preventing a lawful arrest and (2) while Lynch was engaged, or was an accomplice in the commission of the crime of robbery.

[2]The State correctly notes that where an aggravating circumstance is deemed invalid, it is appropriate for this Court re-weigh the remaining aggravating circumstances. *See* Miss. Code Ann. § 99-19-105(b); ***McGilberry v. State***, 843 So.2d 21, 29 (Miss. 2003) (holding that if it deems an aggravator invalid, the Court is authorized to reweigh the remaining aggravators against the mitigating circumstances and affirm, hold the error to be harmless, or remand for a new sentencing hearing).

16

¶40.    "The standard for reviewing the sufficiency of the evidence to support an avoiding lawful arrest instruction is well-settled[.]" *Wiley v. State*, 750 So. 2d 1193, 1206 (Miss. 1999) (quoting *Woodward v. State*, 726 So.2d 524, 541 (Miss. 1997) (internal quotation marks omitted)).

> Each case must be decided on its own peculiar facts. If there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance.

*Wiley*, 750 So. 2d at 1206 (quoting *Chase v. State*, 645 So.2d 829, 858 (Miss. 1994)). Therefore, this Court must determine whether "'there is any credible evidence upon which the jury could find the aggravating circumstance in question.'" *Id.* (quoting *Woodward*, 726 So. 2d at 541).

¶41.    This Court has considered the "preventing lawful arrest" aggravating circumstance in numerous cases. *See, e.g.*, *Hughes v. State*, 735 So. 2d 238 (Miss. 1999); *Wiley v. State*, 750 So. 2d 1193 (Miss. 1999); *Walker v. State*, 740 So. 2d 873 (Miss. 1999); *Edwards v. State*, 737 So. 2d 275 (Miss. 1999); *Foster v. State*, 687 So. 2d 1124 (Miss. 1996); *Brown v. State*, 682 So. 2d 340 (Miss. 1997); *Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

¶42.    The Court's analysis on this issue is fact-specific. Thus, a review of the record is necessary to determine whether the aggravating circumstance was properly submitted to the jury. The crimes alleged here were committed in Boyle, Mississippi. Neither Scott nor Lynch lived in Boyle or Cleveland at the time of the acts alleged. Therefore, the State argues that Lynch and Scott chose to commit these crimes in a town where their identities would be unknown. In addition, the State argues that Lynch's lying down in the car while he and Scott followed Lee is evidence of Lynch's attempt to avoid being seen or identified.

17

¶43.    The State points out that Lynch and Scott, instead of commencing the attack in one of the public parking lots Lee stopped at before returning home, followed Lee to his home in a secluded, non-public place before committing the crimes.  Moreover, two shots were fired at Mrs. Lee.  Mrs. Lee testified that she opened the garage door to see what was going on between her husband and a tall, African American man in the garage.  When the man saw her, he fired two shots at her.  There are no facts in the record that indicate Lynch and Scott knew that Mrs. Lee was at the Lee residence on the day of the shooting.  Furthermore, Lynch was seen "driving real slow" in the area where Scott left the stolen car on the day of the robbery and shooting.  Lynch was also seen looking toward the old gin, where Scott left the Lees' car, his driver's license, and the .380 pistol.  In addition, there is no evidence in the record that Lee was armed at the time of the shooting.

¶44.    Considering the facts in the record, we find  that there is sufficient evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to "cover their tracks" so as to avoid apprehension and eventual arrest by authorities.  Therefore, we hold  that the trial judge did not err in charging the jury as to the "preventing lawful arrest" aggravating factor.

## IV.    Whether the Trial Court Correctly Applied the Precepts of *Batson* and its Progeny.

¶45.    Lynch next argues that the jury panel was "methodically purged of all African Americans" and that the trial court erred in overruling his ***Batson*** challenge.  According to the State, it can be surmised that there were actually African Americans on the trial jury.  In any event, the State contends that the trial judge required race-neutral reasons for the district attorney's exercise of peremptory challenges.

¶46.    In evaluating a ***Batson*** challenge, this Court applies the following standard of review:

> We give great deference to the trial court's findings of whether or not a peremptory challenge was race-neutral.... Such deference is necessary because finding that a striking party engaged in discrimination is largely a factual finding and thus should be accorded appropriate deference on appeal.... Indeed, we will not overrule a trial court on a *Batson* ruling unless the record indicates that the ruling was clearly erroneous or against the overwhelming weight of the evidence....

*Walker v. State*, 815 So. 2d 1209, 1214 (Miss. 2002) (quoting *Thorson v. State*, 721 So.2d 590, 593 (Miss.1998)).

¶47.    Under *Batson*, when a prosecutor exercises a peremptory challenge against a member of a distinct racial group, he or she must articulate race-neutral reasons for the challenge. *Rogers*, 847 So. 2d at 862. The trial judge acts as finder of fact when a *Batson* issue arises. *Walker*, 815 So. 2d at 1215. "The race neutral explanations must be viewed in the light most favorable to the trial court's findings." *Id.* *Batson* requires a three-pronged inquiry.

¶48.    First, "the party objecting to the peremptory challenge must first make a prima facie showing that race was the criteria for the exercise of the peremptory strike." *McFarland v. State*, 707 So. 2d 166, 171 (Miss. 1997) (citing *Batson v. Kentucky*, 476 U.S. 79, 96-97, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986) ; *Stewart v. State*, 662 So.2d 552, 557 (Miss.1995)). To establish a prima facie case of discrimination, the defendant must demonstrate:

> (1) that he is a member of cognizable racial group; (2) that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race; (3) and the facts and circumstances raised an inference that the prosecutor used his peremptory challenges for the purpose of striking minorities.

*Snow v. State*, 800 So.2d 472, 478 (Miss. 2001). However, where the trial court does not explicitly rule on whether the defendant established a prima facie case under *Batson* but nevertheless requires the

19

State to provide race-neutral reasons for its challenges and the State provides reasons for its challenges, the issue of whether the defendant established a prima facie case is moot. *Id.* at 478-79.

¶49.    Second, the burden shifts to the party who exercised the challenge give a race-neutral reason for exercising the peremptory strike. *McFarland*, 707 So.2d at 171. For purposes of the second prong of *Batson*, "[t]he establishment of a race neutral reason is not a difficult task." *Stewart*, 662 So. 2d at 558. It is clear that for purposes of *Batson's* second prong, "any reason which is not facially violative of equal protection will suffice":

> The second step of this process does not demand an explanation that is persuasive, or even plausible. "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."

*Randall v. State*, 716 So. 2d 584, 588 (Miss. 1998) (quoting *Purkett v. Elem*, 514 U.S. 765, 767-68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)) (brackets in original) (internal citations omitted). After the State offers its reasons for striking a potential juror, the defendant is allowed to rebut the reasons offered by the State. *Walker*, 815 So. 2d at 1215. In the absence of any rebuttal by the defendant, the trial judge is limited to an examination of the reasons given by the State. *Id.* In other words, "[i]t is incumbent upon a defendant claiming that proffered reasons are pretextual to raise the argument before the trial court. The failure to do so constitutes waiver." *Manning v. State*, 735 So. 2d 323, 339 (Miss. 1999) (citing *Mack v. State*, 650 So. 2d 1289, 1297 (Miss. 1994)).

¶50.    This Court gives great deference to the trial court in "determining whether the offered explanation under the unique circumstances each case presents is truly a race-neutral reason." *Webster v. State*, 754 So. 2d 1232, 1236 (Miss. 2000). This is true because "the demeanor of the attorney making the challenged is often the best evidence on the issue of race neutrality." *Walker*, 815 So. 2d at 1215. "The

20

race neutral explanations must be viewed in the light most favorable to the trial court's findings." *Id*. The trial judge must "determine whether a discriminatory motive drives the reasons given for striking a potential juror." *Id.* This determination "will likely turn on a trial judge's evaluation of a presenter's credibility and whether an explanation should be believed." *Id.*

¶51.    This Court has set out a non-exhaustive list of race-neutral reasons for the exercise of peremptory challenges: "living in a "high crime" area, body language, demeanor, prosecutor's distrust of the juror, inconsistency between oral responses and juror's card, criminal history of juror or relative, social work and other types of employment, and religious beliefs." *Id.* (citing *Lockett v. State*, 517 So. 2d 1346, 1356-57 (Miss. 1988)).

¶52.    Under the third prong of *Batson,* "the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory." *McFarland*, 707 So. 2d at 171. That is, "the persuasiveness of the justification becomes relevant" in this step of *Batson* analysis. *Randall*, 716 So. 2d at 588. "At the final stage of the *Batson* analysis, the trial court determines if the reasons given by the prosecution were pretexts for intentional discrimination." *Berry v. State*, 802 So. 2d 1033, 1040 (Miss. 2001). The Court has specified five indicia of pretext for use in analyzing a proffered race-neutral reason for peremptory strikes under *Batson*:

> (1) disparate treatment, that is, the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge; (2) the failure to voir dire as to the characteristic cited; ... (3) the characteristic cited is unrelated to the facts of the case; (4) lack of record support for the stated reason; and (5) group-based traits.

*Manning v. State*, 765 So. 2d 516, 519 (Miss. 2000) (quoting *Mack v. State*, 650 So. 2d 1289, 1298 (Miss. 1994)). In determining whether a race-neutral explanation is pretextual, the burden remains with

the opponent of the strike. *Berry*, 802 So. 2d at 1042 (citing *Spann v. State*, 771 So.2d 883, 904 (Miss. 2000)).

¶53. It is difficult to ascertain from the trial record as to whether any African Americans served on Lynch's trial jury. Certainly, a better record should have been made regarding this issue. Certain jurors did not complete juror questionnaires, which inquired as to potential jurors' racial backgrounds. In addition, the Index to Juror Questionnaires does not list all of the jurors. In some proceedings, the jurors are referred to by number, and in others they are referred to by name. Collectively, these factors make reconstructing the jury's racial composition a difficult task indeed. Lynch contends in his brief that he was tried without any African Americans on the panel. The report of the trial judge filed with this Court states that members of Lynch's race were represented on the jury, however, this report does not reflect the actual number of African Americans that served on the trial jury. The State surmises that at least two African Americans served on the jury.

¶54. This Court has carefully reviewed the record and finds the following is clearly reflected by the record: The trial judge read the names of the jurors who served and the alternate jurors into the record. The following names were read as jurors; Ralph, Sabrina, Sherry, Darryl, Deanna, Terry, Natalie, Linda, Marcy , David, Janice, Michell. The following names were read as alternates: Keleigh, Shelia , Priscilla, and Dawn. The trial judge also cited the juror numbers of each of these jurors. Examination of the juror questionnaires corresponding to these respective jurors reveals the following: two of the jurors listed their race as black on the juror questionnaire; Sherry and Darryl. One of the alternates listed her race as black; Priscilla. There is no indication in the record of any juror having to be replaced by an alternate. Thus, contrary to Lynch's claim, this Court concludes that the State is correct, two jurors who were African American served on this jury.

22

¶55.    Lynch argues that peremptory challenges were improperly exercised against five of the potential jurors.  Lynch makes the following assertions regarding the jurors against whom peremptory challenges were exercised:  Juror 22 was challenged because that juror "had tried very hard to get off"; Juror Number 25 was challenged because that juror "didn't want to serve"; Juror 27 was challenged, in the end, because "he wanted to get off"; Juror 41 was challenged because she was disabled; and Juror 47 was challenged because she never had a job.  Lynch concludes that these are not race neutral reasons.

¶56.    However, the State contends that Lynch failed to assert any pretext at trial regarding jurors 25, 27, 41, and 47.    Thus, pursuant to this Court's jurisprudence on failure to assert pretext at trial, the State argues that Lynch is procedurally barred from raising the *Batson* issue on appeal as to Jurors 25, 27, 41, and 47. *Manning v. State*, 735 So. 2d 323, 339 (Miss. 1999) (holding that defendant's failure to raise issue of pretext at trial constitutes a waiver); *Manning v. State*, 726 So. 2d 1152, 1182 (Miss. 1998) (holding that defendant waived his right to contest the striking of potential jurors where defense counsel offered no rebuttal to the prosecutor's challenges) (overruled on other grounds by *Weatherspoon v. State*, 732 So.2d 158, 162 (Miss. 1999)); and *Woodward v. State*, 726 So. 2d 524, 533 (Miss. 1997) (holding that "[i]n the absence of an actual proffer of evidence by the defendant to rebut the State's neutral explanations, this Court may not reverse on this point").

¶57.    During jury selection, Lynch argued that although the State accepted some African American jurors, the State only exercised challenges against African Americans:

> BY THE COURT: Okay. [Defense Counsel has] finally pushed the right button.  Mr. [District Attorney], [Defense Counsel] is saying that even though you have left some blacks on, the only strikes that you have used have been against black jurors.  And in view of that, I'm going to ask that you give a race neutral reason..., starting with [Juror] number 4.

Thus, Lynch claims the trial court did not make an express finding that Lynch established a prima facie case under **Batson.** This issue of whether Lynch made a prima facie case is moot, however, since the trial court required race-neutral reasons for the State's challenges. Each of the peremptory challenges raised in this appeal will be considered individually.

**Juror Number 22**

¶58. Beginning with Juror 22, the record reflects the following argument before the trial judge:

BY MR. [DISTRICT ATTORNEY] MELLEN: She tried very hard to get off saying she was the only parent and she had hardships. She answered in her questionnaire that what she watches is cartoons on T.V. But anyway, she had tried very hard to get off.

BY THE COURT: Okay. That's a race-neutral reason.

BY MR. [DEFENSE COUNSEL] SHAH: Your Honor, we would point out to the Court that the State accepted Juror No. 14 that also had a hardship.

BY THE COURT: Did she also watch cartoons that she feels she needs to get back to?

BY MR. SHAH: Well, I never heard that.

BY THE COURT: Well, [Mr. Mellen] said it's in her questionnaire.

BY MR. SHAH: And we would also point out that the State accepted Juror No. 10 who also said that there was a hardship.

BY MR. MELLEN: Judge, that's incorrect. Juror No. 10 did not say a hardship. Juror No. 14 you may recall said she had taken care of her problems and you commended her for having done it.

BY THE COURT: Okay. Well, the Court accepts the explanation given for S-2 which is juror 22 with the defense's objections noted....

¶59. The thrust of Lynch's argument on appeal is the trial judge erred when he accepted as a race-neutral reason Juror 22's desire to get off the jury. This Court has held that "[a] juror's reluctance to serve or preoccupation with matters outside the courtroom is a valid race-neutral reason for purposes of

24

*Batson*." *Manning*, 735 So. 2d at 340 (citing *Walker v. State*, 671 So.2d 581, 627-28 (Miss.1995)). In *Brewer v. State*, 725 So. 2d 106, 122 (Miss. 1998), this Court considered a *Batson* challenge where the State struck an African American juror who "had attempted to get off jury duty from the start." The trial court concluded that the State offered sufficiently race-neutral reasons for the strike and this Court deferred to that conclusion. *Id.* at 122.

¶60.     While not raised by Lynch in this appeal, it appears that defense counsel at trial attempted to argue pretext, i.e., disparate treatment, as to Juror 22's hardship response - that is, defense counsel pointed out that the State did not challenge two other jurors that cited hardships. "Disparate treatment is strong evidence of discriminatory intent." *Manning*, 765 So. 2d at 516. However, in pretext analysis "disparate treatment is only one factor to be considered by the trial court; it is not necessarily dispositive of discriminatory treatment." *Berry*, 802 So. 2d at 1039 (citing *Manning*, 765 So. 2d at 520-21). "Where multiple reasons lead to a peremptory strike, the fact that other jurors may have some of the individual characteristics of the challenged juror does not demonstrate that the reasons assigned are pretextual." *Id.* at 1040 (citing *Manning v. State*, 726 So.2d 1152, 1186 (Miss. 1998)). Here, the district attorney cited Juror 22's desire to get off the jury and the fact that she liked to watch cartoons on television **in addition** to the alleged pretextual reason, i.e., that she had a hardship.

¶61.     Based on the facts in the record and controlling case law, we find that there was no *Batson* violation in this case as to Juror Number 22. First, the trial judge required the District Attorney to provide race-neutral reasons for his peremptory challenges after defense counsel raised *Batson*. The trial judge, to whom this Court affords great deference in the context of *Batson* fact-finding, concluded on the record that the State's reasons for striking Juror Number 22 were race-neutral. In addition, Lynch's argument

25

that a juror's desire to avoid jury service is not a race-neutral reason is contrary to this Court's holdings in *Manning* and *Walker*. Therefore, the trial court did not clearly err in concluding that Juror 22 was challenged for race-neutral reasons. Finally, although not raised by Lynch in this appeal, there is no evidence of pretext in the State's exercise of its challenge since the District Attorney pointed out two reasons for the challenge in addition to the fact that Juror 22 had a hardship.

### Juror Number 25

¶62. With respect to Juror Number 25, the record reflects the following argument before the trial court:

> BY MR. [DISTRICT ATTORNEY] MELLEN: Your Honor, this is the gentleman who was concerned about the fact that he's a foreman out there and somebody having to fill in for him. He's the only one. He's got nine people who work under him and he seem [sic] to be quite concerned over that, so that's the reason I challenged him.

> BY THE COURT: Accepted....

The record shows that defense counsel made no attempt to rebut the State's assertions as to Juror 25.

¶63. In *Finley v. State*, 725 So.2d 226, 240 (Miss. 1998), the defendant met the burden imposed under the first prong of *Batson*, showing that State used three of four peremptory challenges against black jurors. The State gave race-neutral reasons for its challenges and therefore satisfied prong two. *Id.* Specifically, the State challenged one of the African American jurors because "she had stated that she needed to be at work." The juror's "principal wanted her there and she [felt] like she could get by for a couple of days but she [didn't] want to be [on the jury] all week." *Id.* The trial court concluded that the proffered reasons were race-neutral. *Id.* Noting the great deference afforded to a trial court's determination of "whether the offered explanation under the unique circumstances of the case is truly a race-neutral reason," this Court concluded that the trial court did not clearly err in denying Finley's *Batson* motion. *Id.*

26

¶64. In *Taylor v. State*, 733 So.2d 251, 255 (Miss. 1999), the defense attempted to strike two jurors because they were needed at work. First, the defense sought to strike a juror because he was a pension specialist and might be needed at work. *Id*. Moreover, the defense attempted to strike a juror because he was self-employed. The trial court rejected the defense's assertions that these reasons were race-neutral. *Id.* This Court concluded that "the explanations were neutral in that they were not facially discriminatory." *Id.* at 259. "Therefore, the circuit court was clearly erroneous in failing to accept as race-neutral the explanations the defense gave for striking the two jurors." *Id.*

¶65. We find that no *Batson* violation occurred with respect to Juror 25. First, this Court's holdings in *Manning v. State*, 735 So. 2d at 339, *Manning v. State*, 726 So. 2d at 1182, and *Woodward v. State* make clear that a defendant's failure to assert pretext at trial constitutes a waiver of this issue on appeal. The record indicates that Mr. Shah, Lynch's trial counsel, failed to rebut the District Attorney's assertions as to this peremptory challenge. However, notwithstanding the procedural bar, this Court has held that concern regarding a potential juror's employment is a race-neutral reason for exercising a peremptory strike. The trial judge is limited to an examination of the reasons given by the State when the defendant fails to rebut the State's proffered reasons. Moreover, this Court affords great deference to the trial judge's determination of race-neutrality. Thus, the trial court did not clearly err in deeming race-neutral the State's reason regarding Juror 25's employment.

**Juror Number 27**

¶66. The trial court heard the following arguments regarding Juror Number 27:

BY MR. MELLEN: And [Juror] Nathaniel Carter, Your Honor, my concern was that we had dealt with Carter in Shaw, Mississippi, and I think I was Nathaniel, a Nathaniel Carter who is a police officer, and we've had some difficulty in getting some cooperation out of

Shaw and had words with him, that is, with the law enforcement down there at grand juries and whatever, and we felt that that was encountering putting on a jury.

BY THE COURT: Okay. That is accepted. I could say more but I don't think it would be proper, but it's accepted based on what has been said.

Again, defense counsel made no rebuttal arguments as to the State's assertions.

¶67. In *Lockett*, this Court set out a non-exhaustive list of race-neutral reasons that have been accepted in other jurisdictions. *Lockett*, 517 So. 2d at 1356-57. The Court concluded that a prosecutor's distrust of a potential juror is a race-neutral reason for challenging the juror. *See also **Walker***, 815 So. 2d at 1215.

¶68. The State argues here that the District Attorney's comments show a distrust of Juror Number 27. The arguments show that the District Attorney had prior dealings with Juror 27 and that the two had "words" in the past. That is, the record reflects that the District Attorney had some type of professional difficulty with Juror 27.

¶69. We find that no *Batson* violation occurred as to Juror 27. First, this issue is waived as to Juror 27 since defense counsel failed to rebut the State's proffered reasons before the trial court. Alternatively, regardless of the procedural bar, considering the issue on its merits it appears from the record that the District Attorney's proffered reason for challenging Juror 27 was race neutral. This Court has held that distrust of a potential juror is a race-neutral reason for striking that juror. As the record indicates, the District Attorney had encountered professional difficulties with this potential juror in the past. Thus, it is reasonable to infer that the District Attorney did not trust the juror to be impartial and fair as a juror in this case. Given the great deference afforded to the trial court in judging the credibility of a party's proffered reasons for challenging a juror, we find that the trial court did not clearly err in accepting as a race-neutral reason the District Attorney's past professional difficulties with Juror 27.

**Juror Number 41**

¶70.    The trial court heard the following argument regarding Juror 41:

> BY MR. MELLEN: And then [Juror] 41, Your Honor, is a disabled person and I'm
> concerned about her serving on a jury in that capacity. I'm not against disabled people,
> but this is serving on a capital murder jury, and I'm not sure that that might be affecting her
> - it says that on the jury information.
> BY THE COURT: Okay. Mr. Shah, I believe you have another strike left.

The record indicates that defense counsel did not rebut the State's arguments regarding Juror 41.

¶71.    In *Berry*, the State challenged a potential juror on the ground that she was disabled. During voir dire, the juror indicated that she had diabetes. 802 So. 2d at 1043. Considering the race-neutrality of a challenge based on physical disability, this Court concluded that "[n]umerous other jurisdictions have held that the concern about inattentiveness of a potential juror because of a medical condition, and about his or her inability to sit through course of trial because of the condition, is a race-neutral reason." *Id.* at 1044.

¶72.    Because defense counsel failed to rebut the State's assertions regarding the reasons for its peremptory challenge, this issue is procedurally barred from review on appeal. Alternatively, considering the issue on its merits, we find that no *Batson* violation occurred regarding Juror 41. As discussed above, this Court has held that concerns regarding a potential juror's physical disabilities is a sufficiently race-neutral reason for peremptorily challenging a juror. We note that this record does not disclose the type of disability of this juror. Accordingly, we remind and caution District Attorneys, defense counsel, and trial judges to adequately inform the appellate courts with sufficient facts in order that we might be able to more fully and adequately address issues such as this one. This Court has stated, "We point out the difficulties involved in every *Batson* determination in order to admonish parties that the failure to provide this Court

29

with a complete record for our review only complicates matters." ***Hatten v. State***, 628 So. 2d 294, 298 (Miss. 1993). However, we are bound by the record at hand. Pursuant to our precedent case law, we hold that a disability of a juror is a race-neutral reason. We also note that because the District Attorney based the peremptory challenge on the juror's physical disability, which is a race-neutral reason under this Court's decisions, and the trial judge is limited to an examination of the State's proffered reasons where the defendant fails to rebut those reasons, we find that the trial judge did not clearly err in accepting the State's proffered race-neutral reasons as to its challenge of Juror 41.

### Juror Number 47

¶73. The record reflects the following arguments before the trial court with respect to Juror Number 47:

> BY MR. MELLEN: We would strike [Juror] Number 47....47 being that she said I've never worked. She got her children and I asked her that question if she's ever been employed and she said no, I've never had a job. So I would object to her being on there....

> BY THE COURT: All right. Both of those [reasons as to Juror 47 and another juror] are accepted as race neutral reasons....

Defense counsel made no rebuttal to the State's argument regarding Juror 47.

¶74. "This Court has recognized unemployment as a race-neutral reason and sufficient basis for a peremptory strike." ***Manning***, 735 So. 2d at 340 (citing ***Woodward***, 726 So.2d at 530). In addition, this Court has held:

> Pursuant to ***Batson***, this Court has acknowledged that there are infinite number of grounds upon which a prosecutor reasonably may peremptorily strike a juror so long as the prosecutor presents clear and reasonably specific explanations for those reasons....Among the reasons accepted as race-neutral are ... **unemployment [and] employment history**....

***Berry v. State***, 802 So.2d at 1046 (emphasis added) (internal citations omitted).

¶75. We find that there was no ***Batson*** violation as to Juror Number 47. Again, this issue is procedurally barred due to defense counsel's failure to rebut the State's assertions before the trial court. In addition, this Court's case law clearly shows that unemployment is a race-neutral reason for exercising a peremptory strike. Thus, notwithstanding the procedural bar, we find that the trial court did not clearly err in concluding that the State's reasons as to this challenge were race-neutral.

¶76. For the foregoing reasons this Court holds that no ***Batson*** violation occurred in this case as to Jurors 22, 25, 27, 41, and 47.

> **V. Whether the Verdict Was Against the Overwhelming Weight of the Evidence.**
>
> **VI. Whether the Evidence Was Sufficient to Support the Verdict.**
>
> **VII. Whether the Trial Court Properly Overruled the Motion for a Directed Verdict of Acquittal at the Close of the State's Case-in-chief and at the Close of All the Evidence.**

¶77. Lynch argues that the verdict was against the overwhelming weight of the evidence and that the evidence at trial did not support the verdict. The State argues that the verdict is in accord with the weight and sufficiency of the evidence presented. With respect to his motion for directed verdict, Lynch apparently argues[3] that because there are no eyewitnesses and no confessions in this case, ***Weathersby v. State***, 165 Miss. 207, 209, 147 So. 481, 481 (1933), requires this Court to accept Lynch's version of the events surrounding the crimes alleged. Lynch argues that he had no knowledge, no criminal intent,

---

[3]Lynch raises the ***Weathersby*** issue in his sixth assignment of error, i.e., that the verdict was against the overwhelming weight of the evidence. In his discussion, Lynch does not argue that ***Weathersby*** mandates a directed verdict in the case sub judice. Rather, Lynch simply states that the Court must accept as true Lynch's version of the events surrounding the crimes. However, the State concludes, as we do, that Lynch's discussion of the case amounts to an assertion that ***Weathersby*** requires a directed verdict in this case. It will thus be treated as such.

31

and did not assist or cooperate in the shooting of Lee. Lynch argues that he simply went with a friend to look for a car. Though he admits giving the gun to Scott, Lynch claims the exchange was done several months prior to the murder and not immediately preceding the crime. However, initially Lynch denied knowledge about the gun. The State asserts that, based on the facts of this case, **Weathersby** is inapplicable because Lynch's version is completely unreasonable.

¶78. This Court, in evaluating the weight of the evidence in a criminal trial, applies the following standard of review:

> In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial. Only in those cases where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal. As such, if the verdict is against the overwhelming weight of the evidence, then a new trial is proper.

**Kingston v. State**, 846 So.2d 1023, 1025-26 (Miss. 2003) (quoting **Pruitt v. State**, 807 So.2d 1236, 1243 (Miss. 2002). In reviewing the sufficiency of evidence, the Court applies the following standard:

> When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by considering all of the evidence--not just that supporting the case for the prosecution--in the light most consistent with the verdict. We give prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb.

**Vaughn v. State**, 712 So.2d 721, 723 (Miss. 1998) (quoting **McFee v. State**, 511 So.2d 130, 133-34 (Miss.1987)). Finally, in reviewing the denial of a motion for JNOV,

[T]his Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inferences that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.

*Kingston*, 846 So. 2d at 1025 (quoting *Pruitt*, 807 So. 2d at 1243).

¶79.    Where a defendant is charged with aiding and abetting a felony, the prosecution "must establish in the proof, 'beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis that the crime charged was committed by another, and to further prove ... that the accused was present, consenting, aiding, and abetting such person in the commission of the crime charged.'" *Brooks v. State*, 763 So.2d 859, 861 (Miss. 2000) (quoting *Van Buren v. State*, 498 So.2d 1224, 1227 (Miss. 1986)). Moreover, this Court has held:

Aiding and abetting is defined to be the offense committed by those persons who, although not the direct perpetrators of a crime, are yet present at its commission, doing some act to render aid to the actual perpetrator. ... And such aiding and abetting may be manifested by acts, words, signs, motions, or any conduct which unmistakably evinces a design to encourage, incite or approve of the crime, or even by being present, with the intention of giving assistance, if necessary, though such assistance may not be called into requisition.

*Swinford v. State*, 653 So.2d 912, 915 (Miss. 1995) (quoting *Wynn v. State*, 63 Miss. 260 (1885)) (internal quotation marks omitted).

¶80.    In considering a defendant's motion for directed verdict, "the trial judge must accept as true all evidence favorable to the State and all reasonable inferences flowing therefrom. Evidence favorable to the defendant must be disregarded." *Walters v. State*, 720 So.2d 856, 866 (Miss. 1998) (quoting *Ellis v. State*, 667 So.2d 599, 612 (Miss.1995)). However, in *Weathersby*, 165 Miss. at 209, 147 So. at 481, this Court concluded that if "the defendant or the defendant's witnesses are the only eyewitnesses to the

33

homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge." Thus, "[a] defendant who met the *Weathersby* Rule would be entitled to a directed verdict of acquittal." *Walters*, 720 So. 2d at 866 (quoting *Blanks v. State*, 547 So.2d 29, 33 (Miss. 1989)). The *Weathersby* Rule, however, "is only applicable where the defendant's version is reasonable, unopposed by other testimony, and is uncontradicted by the physical evidence." *Turner v. State*, 796 So.2d 998, 1002 (Miss. 2001). That is, "[a]s stated in *Weathersby*, and many of our subsequent decisions, this rule has no application where the defendant's version is patently unreasonable, or contradicted by physical facts." *Taylor v. State*, 795 So.2d 512, 517 (Miss. 2001).

¶81.    As the record indicates and Lynch concedes in his brief, there is no dispute that Kevin Scott shot and killed Richard Lee on November 15, 1995. However, at trial, Lynch maintained that he did not aid and abet Kevin Scott in the shooting of Richard Lee. First, while he knew Scott had a gun, Lynch claims that he thought that Scott intended to purchase a car in Cleveland that day. Lynch also maintained that during the time Scott followed Lee from the liquor store, Lynch was lying down in the car. According to Lynch, he did not drive the car that the two drove to Cleveland until they left the Lee residence. Moreover, Lynch told the police that he did not see Kevin Scott shoot Richard Lee. Lynch stated that he left the Lee residence, he was driving the car slowly because the brake shoes were bad. Moreover, Lynch testified that he gave the gun to Kevin Scott in August of 1995, approximately three months before the shooting.

¶82.    However, the State showed that Lynch was seen driving slowly around the area in which the Lees' car, Scott's identification, jacket, and the murder weapon were found. Two eyewitnesses who knew Lynch testified that Lynch stopped the car he was driving, got out, and looked across the field toward the

34

old gin area (where the car, jacket, identification, and gun were found). The State also linked the murder weapon to Lynch by testimony of D'Angelo Johnson although, according to Lynch, the gun passed through his hands several months before the shooting actually occurred. Lynch claimed all three of these witnesses were lying. The State points out that Lynch and Scott rode around Cleveland and never went to a used car dealership. Moreover, Lynch drove away from the Lee residence in the car that he and Scott were riding in originally. When he left the Lee residence, Lynch claim that he drove the car to Scott's house in Davenport.

¶83.    Given the deferential standards of review and the facts adduced at trial, we find that these three assignments of error are without merit. Considering the weight of the evidence, accepting as true the evidence which supports the verdict, it is clear that the circuit court has not abused its discretion in failing to grant a new trial. Thus, we find that verdict should not be disturbed on appeal. Also, considering the sufficiency of the evidence, giving the prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence, there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions. Thus, we conclude that the verdict of guilty should stand and that the trial court did not err in refusing the Lynch's motion for JNOV. Finally, we find that Lynch cannot benefit from the *Weathersby* Rule. Lynch arguably does not meet the "eyewitness" requirement of the rule, which expressly requires that "the defendant or the defendant's witnesses to the homicide are the only eyewitnesses to the homicide." In his statement to the police, Lynch stated that he did not see Scott shoot Lynch. Thus, Lynch was not an eyewitness to a homicide. Moreover, there is a strong argument that Lynch's theory of what happened on the day of the shooting is completely unreasonable. Several facts, when considered together, indicate the unreasonableness of

Lynch's version of the events: (1) Lynch knew Scott had a weapon and wanted to get a car in Cleveland; (2) instead of going to used car lots in Cleveland, Scott drove around retail shopping centers until he saw a car that looked like the one he wrecked; (3) even when Scott found a suitable car, he did not offer to purchase it; and (4) Lynch and Scott followed Mr. Lee from store to store until he went home; (5) Lynch initially lied about the gun to officers; and (6) there were several major inconsistencies in Lynch's statement and trial testimony.

**VIII.** **Whether the Hearsay Statements of the Appellant's Co-defendant, Allegedly Made When the Appellant Arrived at the Co-defendant's Home, Were Admissible.**

**IX.** **Whether the Hearsay Statements of the Appellant's Co-defendant, Allegedly Made While Riding to Boyle, Mississippi, Were Admissible.**

¶84.    Lynch argues that the trial court erred in excluding as hearsay portions of his testimony on direct examination. He claims that the testimony was not offered to prove the truth of the matter asserted–that Scott killed Lee–but rather was offered to show Lynch's lack of criminal intent to kill. He further argues that the excluded testimony concerned out-of-court confessions which constitute exceptions to the hearsay rule according to Miss. R. Evid. 803(24). He cites *Kennedy v. State*, 278 So. 2d 404, 406 (Miss. 1973), *Keys v. State*, 635 So. 2d 845, 848-49 (Miss. 1994), and *Terry v. State*, 718 So. 2d 1115 (Miss. 1998), for the proposition that a jury should be allowed to hear any testimony which supports his theory of defense.

¶85.    The State counters that Lynch's failure to make a record by offer of proof concerning the substance of his objectionable testimony handicaps this Court's consideration of the issue. The State also argues that the testimony does not qualify as exception to the hearsay rule, and the substance of the testimony does not help Lynch prove a lack of criminal intent. Furthermore, the jury heard Lynch's own testimony of his lack

36

of intent, the best evidence of this alleged fact. Accordingly, this Court rejects Lynch's arguments because we find that the statements are inadmissible hearsay and Lynch did not create an adequate record from which this Court could examine the merits of his claim. The trial court did not err in excluding this evidence.

¶86. The admission of testimonial evidence is left to the sound discretion of the trial court and it will be found in error only when it has abused that discretion. *Harris v. State*, 731 So. 2d 1125, 1130 (Miss. 1999). Reversible error may be found only where a substantial right of a party is affected and the party claiming error raised an objection or made an offer of proof at trial. Miss. R. Evid. 103(a). *See also Mitchell v. State*, 792 So. 2d 192, 217 (Miss. 2001); *Murphy v. State*, 453 So. 2d 1290, 1293-94 (Miss. 1984); *Brown v. State*, 338 So. 2d 1008, 1009-10 (Miss. 1976); Miss. R. Evid. 103(d). Where no offer of proof has been made, this Court will not speculate about the intentions of the defendant's counsel when asking the question. *Blue v. State*, 674 So. 2d 1184, 1212-13 (Miss. 1996), *overruled on other grounds*, *King v. State*, 784 So. 2d 884 (Miss. 2001).

¶87. The transcript contains the following two exchanges at trial:

> Q: [DEFENSE COUNSEL] And what did Mr. Scott tell you the reason or purpose of him going to Cleveland?
>
> A: [LYNCH] To get a car.
>
> BY MR. [DISTRICT ATTORNEY] MELLEN: Objection, Your Honor. That's hearsay.
>
> * * *
>
> Q: [DEFENSE COUNSEL] And after you arrived back in Davenport, where specifically did you go?
>
> A: [LYNCH] To Scott's house.
>
> Q: And when you arrived at Mr. Scott's house, who, if anyone, was there?

37

Q: [Scott] was there

Q: And tell the members of the jury what happened next.

A: I asked him what happened. He said he had shot somebody. He said he don't know if he killed someone --

BY MR. MELLEN: Your Honor.

BY THE COURT: One moment. Sustained.

In both exchanges, Lynch's counsel failed to argue that such testimony was not hearsay nor did he preserve for the record the testimony he was attempting to elicit from Lynch. Lynch did not give advance notice to the State that he would introduce this hearsay evidence, and he was permitted to testify about his lack of intent to kill that day. Furthermore, his statement to police which was admitted into evidence contains a line of questioning and answers very similar to the ones Lynch provided in the excerpt above.

¶88. The statements Lynch made are hearsay. M.R.E. 801(c). They do not qualify as an exception under M.R.E. 803(24) because they do not possess circumstantial guarantees of trustworthiness, Lynch's testimony was more probative of his lack of intent than Scott's alleged statements, and he did not provide advance notice to the State of his intent to testify about the substance of Scott's statements. Even if the statements were not properly objectionable hearsay, we find no use for this testimony other than letting the jury hear that Scott admitted he was the shooter and wanted to steal a car, and, as a result, the jury should not treat Lynch as harshly. If, in fact, this was its purpose, it has been served. If not, the trial court cannot be found in error because the Court does not know the substance or purpose of the testimony because defense counsel failed to make an offer of proof. The authority Lynch cites in support of his argument that a jury should be allowed to hear any evidence supporting the defendant's theory of the case specifically states that its application is subject to the rules of evidence. *Cf. Terry*, 718 So. 2d at 1122 ("All evidence

38

that is proposed by either side to be used to further its theory, hypothesis, or argument, must first comply with the Mississippi Rules of Evidence . . .") (citing *Kennedy* and *Keys*). These rules dictate exclusion in this instance because the testimony is hearsay. M.R.E. 802. Therefore, we find the trial court did not err in excluding Lynch's testimony as hearsay on the two occasions discussed above.

### X. Whether the Sentence of Death in this Case Conforms with the Federal and State Constitutions.

¶89. Lynch argues the evidence was insufficient to impose the death penalty citing *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). In the same breath he argues his sentence is disproportionate to his participation in this crime. The State responds that there was sufficient evidence for imposition of the death penalty and the sentence is not disproportionate to the crime.

¶90. This Court views the evidence and all reasonable inferences in the light most consistent with the verdict when the defendant challenges the sufficiency of the evidence to support a death sentence. It will not overturn the sentence unless it can conclude that no rational trier of fact could have reached its conclusion beyond a reasonable doubt. *Bishop v. State*, 812 So. 2d 934, 948 (Miss. 2002). "The death penalty cannot be given to an aider and abettor who has not killed, attempted to kill, or contemplated that life would be taken." *Id.* (citing *Enmund*, 458 U.S. at 788-801). According to Miss. Code Ann. § 99-19-105(3)(c), this Court must determine whether the death sentence imposed is excessive or disproportionate considering the crime and the defendant.

¶91. When the jury returned the death sentence, it specifically found that Lynch intended to kill Richard Lee and contemplated that lethal force would be used. It also found that the aggravating circumstances of the offense outweighed the mitigating circumstances.

¶92.    The record indicates that Lynch provided Scott with the gun used to commit the murder. Although the gun transfer was made several months prior to the murder, Lynch knew Scott retrieved the gun shortly before they drove to Cleveland. Lynch also knew that the purpose of the trip to Cleveland was to get a car exactly like the one Scott had wrecked and to do so by force if necessary. He had several opportunities to walk away and discourage the crime while it was in progress. Lynch could have abandoned the plan by leaving the car at any point while he and Scott cruised store parking lots looking for a car, and Lynch did exit the vehicle once in Cleveland to go to the restroom. Lynch could have left the car at any point where Lee stopped before arriving at home, and throughout this entire time, he could have tried to convince Scott not to commit the crime. Lynch married himself to the use of the gun to steal the Lee's car and the resulting consequences by choosing to remain in the car and let the crime go unchecked, serving arguably, as the State suggests, as both lookout and potential getaway driver. It is also reasonable to infer that Lynch knew if Lee were allowed to live after the robbery, he would provide information to police which would result in Lynch's arrest. So would Mrs. Lee explain why Scott attempted to kill her. Thus the jury's conclusion that Lynch intended Lee's death and contemplated the use of lethal force is substantiated by the record.

¶93.    Lynch offered mitigation evidence to refute the State's aggravating evidence. Lynch called Chief Estes as a mitigating witness. Estes testified that Lynch had "no prior record and had been no problem in jail." He also testified that Steve Ivy had on November 16, 1995, given a statement to him in which Ivy stated that he had not seen Lynch on November 15, 1995, which is in stark contrast to his trial testimony.

¶94.    Lynch's mother, Willie May Lynch Sims, testified that Lynch was only 19 years old at the time of this incident. She stated that he was a "nice child" and "ain't been in trouble or nothing." She further testified that Lynch had graduated from high school, had grades of A's and B's, and was "fixing to go to

40

the Navy"; "he had already signed up." She stated that Lynch had a child, born after this incident, to his girlfriend Crystal.

¶95.    Additionally, The Report Of The Trial Judge Where Death Penalty Is Imposed reflects that Lynch's intelligence level is: Medium (IQ. 70–100).

¶96.    On this record we conclude that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor. Further, the evidence supports the jury's finding of a statutory aggravating circumstance.

¶97.    This Court has found that the death penalty is not disproportionate for an aider and abettor who does not necessarily do the actual killing in several instances. *See Bishop v. State*, 812 So. 2d 934 (Miss. 2002); *Simmons v. State*, 805 So. 2d 452 (Miss. 2001); *Smith v. State*, 729 So. 2d 1191 (Miss. 1998); *Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995); *Carr v. State*, 655 So. 2d 824 (Miss. 1995); *Abram v. State*, 606 So. 2d 1015 (Miss. 1992); *Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983). These cases found the death penalty a proportionate sentence for an aider and abettor who did not kill the victim.

¶98.    *Smith* and *Abram* are the most factually similar to Lynch's case. Between the two, the *Smith* case is more on point. Clyde Smith and his brother planned to rob a store one evening. That night, they were seen at a liquor store before it was robbed and its owner murdered. From a fingerprint left on a bag found inside the store it can be concluded that Clyde's brother killed the victim while Clyde played the part of lookout outside. Clyde knew his brother had a gun. *Smith*, 729 So. 2d at 1195-99. Donald Abram confessed that he and a co-defendant shooter decided to rob a store for money. His co-defendant picked up a shotgun and shells "for security" before the crime. The shooter went inside John's Quick Stop and called him inside. There Abram put the money from the register in a bag and went back out to the car.

The shooter then shot the cashier and a store customer who had driven up during the robbery. *Abram*, 606 So. 2d at 1024. The case was reversed for other reasons, but this Court found there to be sufficient evidence to impose the death penalty. *Id.* at 1043. In summary, this Court finds that there is good authority to sustain the death penalty as proportional.

¶99. We find that there is sufficient evidence to support the death penalty here and that it is not excessive or disproportionate to the penalty imposed in similar cases, see Appendix, considering both the crime and the defendant.

## CONCLUSION

¶100. For the above-discussed reasons, we find that the trial court did not err in instructing the jury on the State's burden of proof in the guilt and sentencing phases of trial. Neither did the court err in applying *Batson* and its progeny during voir dire, nor when the trial court denied the motion for a directed verdict and excluded two hearsay statements. The evidence is sufficient to support the jury's guilty verdict and the verdict is not against the overwhelming weight of the evidence. There is sufficient evidence to support the finding of the aggravating circumstance of preventing a lawful arrest. The death sentence withstands constitutional scrutiny and is not cruel and unusual punishment under the circumstances, and it is not disproportional to the crime. Therefore, this Court affirms the judgment and sentence in all respects.

¶101. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION AFFIRMED.**

**WALLER AND COBB, P.JJ., EASLEY, CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. DIAZ, J., NOT PARTICIPATING.**

# APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Byrom v. State,* --- So.2d --- (Miss. 2004).

*Howell v. State,* 860 So.2d 704 (Miss. 2003).

*Howard v. State,* 853 So.2d 781 (Miss. 2003).

*Walker v. State,* 815 So.2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So.2d 934 (Miss. 2002).

*Stevens v. State,* 806 So.2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So.2d 241 (Miss. 2002).

*Knox v. State,* 805 So.2d 527 (Miss. 2002).

*Simmons v. State,* 805 So.2d 452 (Miss. 2002).

*Berry v. State,* 802 So.2d 1033 (Miss. 2001).

*Snow v. State*, 800 So.2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So.2d 192 (Miss. 2001).

*Puckett v. State,* 788 So.2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So.2d 639 (Miss. 2001).

*Jordan v. State,* 786 So.2d 987 (Miss. 2001).

*Manning v. State,* 765 So.2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999).      *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi,* 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

## DEATH CASES AFFIRMED BY THIS COURT

## (continued)

*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi*, 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

# DEATH CASES AFFIRMED BY THIS COURT

## (continued)

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

   \* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

# DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCE PHASE

*Flowers v. State,* 842 So.2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

## DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCE PHASE
### (continued)

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

# DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## <u>FOR RESENTENCING TO LIFE IMPRISONMENT</u>

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# ON SENTENCING PHASE ONLY

*King v. State,* 784 So.2d 884 (Miss. 2001).

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

   ***Shell v. State***, 554 So. 2d 887 (Miss. 1989), ***Shell v. Mississippi***, 498 U.S. 1 (1990) reversing, in part, and remanding, ***Shell v. State*** 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

   **Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), ***Pinkney v. Mississippi,*** 494 U.S. 1075 (1990) vacating and remanding, ***Pinkney v. State,*** 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

   ***Clemons v. State***, 535 So. 2d 1354 (Miss. 1988), ***Clemons v. Mississippi***, 494 U.S. 738 (1990) vacating and remanding, ***Clemons v. State***, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

   ***Jones v. State***, 517 So. 2d 1295 (Miss. 1987), ***Jones v. Mississippi,*** 487 U.S. 1230 (1988) vacating and remanding, ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

## DEATH CASES REVERSED AS TO
## PUNISHMENT AND REMANDED FOR A NEW TRIAL
## ON SENTENCING PHASE ONLY
### (continued)

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State*, 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984). * Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.